IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| **Ann Smith**, et al.,<br><br>                    Plaintiffs,<br><br>v.<br><br>**New Jersey Education Association**,<br>et al.,<br><br>                    Defendants. | Case No. 1:18-cv-10381-RMB-AMD |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND PERMANENT INJUNCTION

# TABLE OF CONTENTS

Table of contents ................................................................................... i

Table of authorities .............................................................................. iii

Introduction ........................................................................................... 1

   I.   The Workplace Democracy Enhancement Act ............................. 1

   II.  The NJEA's Membership Application ........................................... 2

Undisputed facts ................................................................................... 4

The union's shifting interpretations of section 6 ................................. 5

Summary of argument .......................................................................... 8

Argument ............................................................................................ 11

   I.   Section 6 is unconstitutional and its enforcement must be enjoined .......... 11

      A. Section 6 is the exclusive means for a public employee to halt the payroll deduction of union dues under new jersey law ............................ 13

      B. No public employer may halt the payroll deduction of union dues under section 6 unless the employee provides written notice during the 10-day opt-out window .................................................... 19

   II.  The plaintiffs did not contractually waive their constitutional rights under *Janus* by signing their union-membership applications ........................... 22

      A. The Membership Application Is Not a "Contract" ................................ 23

          1. The membership application is not a "contract" because it bears only the employee's signature and there is no other party to the document .......................................................... 23

          2. The membership application is not a "contract" because it does not provide consideration to the plaintiffs ........................... 24

          3. The membership application did not need to take the form of a contract because New Jersey law at the time mandated that payroll deductions continue until January 1 or July 1 ........................ 25

      B. Even if the membership application were a "contract," it does not satisfy *Janus*'s requirements for a waiver of constitutional rights .......... 26

      C. The Second Circuit's ruling in *NLRB v. Penn Cork* allows any employee who authorized payroll deductions while working in a union shop or agency shop to rescind that authorization if his

employer becomes right to work, even if the employer signed a previous dues authorization .................................................................29

Conclusion ........................................................................................32

Certificate of service........................................................................33

# TABLE OF AUTHORITIES

## Cases

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) .................................................... 11

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ........................................... 16

*Brady v. United States*, 397 U.S. 742 (1970) ............................................................ 28

*Friedman v. Tappan Development Corp.*, 126 A.2d 646 (N.J. 1956) .......................... 23

*Golden v. Cty. of Union*, 749 A.2d 842 (N.J. 2000) ................................................. 19

*Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*,
    138 S. Ct. 2448 (2018) ............................................................................. passim

*Johnson v. Zerbst*, 304 U.S. 458 (1938) .............................................................. 27, 28

*Kopczynski v. County of Comden*, 66 A.2d 882 (N.J. 1949) ...................................... 16

*Landgraf v. USI Film Prod.*, 511 U.S. 244 (1994) .................................................... 16

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
    523 U.S. 26 (1998) ...................................................................................... 12

*Merlino v. Borough of Midland Park*, 796 A.2d 203 (N.J. 2002) .............................. 19

*NLRB v. Penn Cork & Closures, Inc.*, 376 F.2d 52 (2d Cir. 1967) ....................... 29, 30

*Segal v. Lynch*, 48 A.3d 328 (N.J. 2012) ................................................................. 25

*Sipko v. Koger, Inc.*, 70 A.3d 512 (N.J. 2013) .................................................... 23, 24

*Skulski v. Nolan*, 343 A.2d 721 (N.J. 1975) ............................................................ 16

## Statutes

42 U.S.C. § 1983 .................................................................................................. 10

N.J. Rev. Stat. § 52:14-15.9e ......................................................................... 1, 2, 13

Plaintiffs Rachel Curcio, Melissa Poulson, Michael Sandberg, and Leonard Santiago move for partial summary judgment and seek a permanent injunction against the enforcement of section 6 of the Workplace Democracy Enhancement Act. The plaintiffs also seek to enjoin the defendants from enforcing any pre-*Janus* union-membership application that purports to require the continued payment of union dues after an employee has resigned from the union.

## INTRODUCTION

### I.   THE WORKPLACE DEMOCRACY ENHANCEMENT ACT

The Workplace Democracy Enhancement Act (WDEA) was enacted on May 18, 2018. Section 6 of the Act amended N.J. Rev. Stat. § 52:14-15.9e. The previous version of section 52:14-15.9e had allowed public employees to revoke at any time the authorizations that they had previously given for payroll deductions of union dues, but it would not allow those revocations to take effect until the next January 1 or July 1—even if the employee had previously resigned his union membership:

> Any such written authorization may be withdrawn by such person holding employment at any time by the filing of notice of such withdrawal with the above-mentioned disbursing officer. The filing of notice of withdrawal shall be effective to halt deductions as of the January 1 or July 1 next succeeding the date on which notice of withdrawal is filed.

*See* Exhibit 1. Under this regime, employees who quit the union and demanded a halt to payroll deductions were compelled to continue paying union dues—despite their resignation from the union—until the next January 1 or July 1, at which time their payroll deductions would be automatically terminated.

Section 6 of the Workplace Democracy Enhancement Act deleted this provision and replaced it with a more restrictive regime:

> Employees who have authorized the payroll deduction of fees to employee organizations may revoke such authorization by providing written notice to their public employer during the 10 days following each anniversary date of their employment. . . . An employee's notice of revocation of authorization for the payroll deduction of employee organization fees shall be effective on the 30th day after the anniversary date of employment.

See Exhibit 1.[1] This prevents public employees from terminating the payroll deduction of union fees unless they provide written notice *during* a 10-day opt-out window that comes around once per year. Any employee who misses the 10-day window is stuck paying dues for at least another year—even if the employee had long ago resigned his union membership. The statute also explicitly prevents unions and employers from implementing a public employee's instructions to halt payroll deductions until 30 days after his employment-anniversary date—even if the public employee had resigned his union membership long before that date.

## II.   The NJEA's Membership Application

The NJEA allows its members to authorize the payment of union dues through payroll deductions when they apply for membership. *See* Statement of Material Facts at ¶¶ 5–8; Exs. 1–4. The union's application form gives employees only two choices

---

1. The Workplace Democracy Enhancement Act is also known as A.3686, and section 6 is codified at N.J. Rev. Stat. § 52:14-15.9e (2013), as amended by A.3686 § 6. For simplicity and ease of exposition, we will refer to this statutory provision as "section 6" throughout our brief.

on how they will pay their dues: "Payroll deduction" or "cash." *See id.* The overwhelming majority of union members opt for payroll deductions because it is more convenient than having to pay cash each month. The NJEA does not offer payment by ACH deduction or credit card, which an employee can terminate unilaterally by instructing his bank or credit-card company to halt the payment of dues.

To authorize the payroll deductions of dues, an applicant must sign the following statement that appears on the NJEA's membership-application form:

> I hereby request and authorize the disbursing officer of the above school district to deduct from my earnings, until notified of termination, an amount required for current year membership dues and such amounts as may be required for dues in each subsequent year, all as certified by the affiliated and unified organizations, such amounts to be paid to such person as may from time to time be designated by the local association. This authorization may be terminated only by prior written notice from me effective January 1 or July 1 of any year. I waive all right and claim for monies so deducted and transmitted and relieve the board of education and its officers from any liability therefore.

*See id.*[2] This statement repeated the requirements of New Jersey law that existed before the Workplace Democracy Enhancement Act, which prohibited a public employee's termination of payroll deductions from taking effect until the next January 1 or July 1. *See* Exhibit 1.

---

2.  This statement appears in each of the four plaintiffs' membership applications. The only discrepancy is that Ms. Poulson's application says "Jan. 1" instead of "January 1." *Compare* Statement of Material Facts at ¶ 5, Ex. 1 *with id.* at ¶¶ 6–8, Exs. 2–4.

## UNDISPUTED FACTS

Plaintiffs Melissa Poulson, Michael Sandberg, and Leonardo Santiago resigned their union memberships shortly after the Supreme Court announced its ruling in *Janus*. Ms. Poulson resigned over the phone on June 28, 2018. *See* Statement of Material Facts at ¶ 16. Mr. Sandberg resigned on June 28, 2018, by e-mailing his union representative. *See id.* ¶ 17; Ex. 9. Mr. Santiago resigned by e-mailing his union representative, with a copy to his employer, on August 8, 2018. *See id.* ¶ 18; Ex. 10.

Under the terms of section 6, however, the plaintiffs were powerless to terminate payroll deductions unless they: (1) Waited until the anniversary date of their employment; (2) Remembered to provide a written notice to their employers during the 10-day opt-out window that begins on the anniversary date of their employment; and (3) Waited until 30 days after their employment-anniversary date for the cancellation of payroll deductions to take effect. *See* Exhibit 1. Mr. Sandberg's employment-anniversary date is August 26, and Ms. Poulson and Mr. Santiago's employment-anniversary dates are September 1. *See* Statement of Material Facts at ¶¶ 1–4. So the plaintiffs could not hope to halt the payment of union dues until September 25, 2018, or October 1, 2018. To prevent the union from tapping their paychecks, the plaintiffs sued the defendants on July 6, 2018, and challenged the constitutionality of section 6. *See* First Amended Complaint (ECF No. 19).

The union continued to collect membership dues from the plaintiffs' paychecks through September of 2018. *See* Statement of Material Facts at ¶ 23. On October 1, 2018, however, the union stopped tapping the plaintiffs' paychecks and instructed the plaintiffs' employers to terminate payroll deductions, even though none of the

plaintiffs had provided "written notice" to their employers during the 10-day window described in the statute. *See* Declaration of Melissa Poulson ¶¶ 4–6; Declaration of Michael Sandberg ¶¶ 4–6; Declaration of Leonardo Santiago ¶¶ 4–6.

Plaintiff Rachel Curcio is a member of NJEA.  Ms. Curcio wants to resign her union membership and stop the payroll deduction of dues, but she sees no point in resigning from the union if she will be compelled to continue paying union dues until 30 days after her employment-anniversary date of September 6, 2018, or if she will be compelled to continue paying for some other period of time. Ms. Curcio is therefore requesting declaratory and injunctive relief that will allow her to terminate payroll deductions immediately upon resigning her union membership, or at least some clarification as to when the union must stop tapping her paycheck after she resigns.

When Ms. Curcio, Ms. Poulson, Mr. Sandberg, and Mr. Santiago applied for union membership, each of them signed an authorization for payroll deductions that contained the language quoted on page 3, *supra*. *See* Statement of Material Facts at ¶¶ 5–8; Exs. 1–4.

## THE UNION'S SHIFTING INTERPRETATIONS OF SECTION 6

After the plaintiffs filed their lawsuit challenging the constitutionality of section 6, the NJEA issued a "revised" guidance document to its affiliates and staff in September 2018. *See* Statement of Material Facts at ¶ 20; Ex. 11.[3] The NJEA announced that it was issuing this revised guidance in response to the plaintiffs' lawsuit. *See id.*

_____

3.  The plaintiffs have not yet obtained the "original" guidance document that the NJEA had issued before its "revised" guidance of September 2018, so at this point we are unable to compare what exactly was "revised" in the document of

The revised guidance document observed that previous New Jersey law had allowed public employees to request a termination of payroll deductions at any time, but prevented those requests from taking effect until the next January 1 or July 1. It also observed that the union had required employees to sign documents acknowledging this requirement of New Jersey law as a condition of joining the union:

> Prior to the spring of 2018, the New Jersey dues deduction law, N.J.S.A. 52:14-15.9e, provided for two dates each year for members to terminate their membership. Those dates were January 1 and July 1, so that when a member requested to terminate membership, that termination became effective on the soonest of those two dates. For many years, NJEA included identical language on the membership applications. Members wishing to terminate could (and continue to be able to) submit notification of their desire at any time during the year.

*See* Statement of Material Facts Ex. 11 at 2. The union, however, acknowledged that section 6 had "changed the termination date to allow for a single drop date each year as well as a specific window to request termination of membership." *Id.* And it explained the requirements of section 6 as follows:

> To terminate membership under the WDEA, notice of termination of membership *must be made* within a window of 10 days following the individual employee's anniversary date of hire. The membership termination becomes effective on the 30th day after the date of hire.

*Id.* (emphasis added).[4] Yet the NJEA simultaneously announced that it would interpret and apply section 6 in the following manner:

---

September 2018. We are currently negotiating with counsel for the NJEA to acquire that document.

4. This statement incorrectly described the requirements of section 6. Section 6 does not restrict a public employee's right to terminate his union *membership*; it

It is NJEA's position that Section 6 does not *compel* all public employers to reject all efforts to revoke payroll deduction authorizations that do not meet Section 6's window requirements. Rather, Section 6 represents a floor to ensure that every public employee in New Jersey, regardless of the contract between the member and her union, has at least one window period every year to revoke payroll deduction authorizations. There is nothing in Section 6 (or its predecessor) that requires any employee to join a union—or even that requires every employee who chooses to join a union to pay dues by payroll deduction. Thus, NJEA believes that the original membership application is a legal and binding contract between the member and the organization. As such, NJEA will continue to honor these termination dates. Additionally, NJEA will continue to follow the New Jersey dues deduction law, N.J.S.A. 52:14-15.9e. During this transitional period, and in the spirit of acting in good faith, NJEA will accept requests to terminate membership at any time during the year. Dues deduction will cease on the earliest of these three dates: January 1, July 1, or during the 10 days following each anniversary date of a member's employment.

*Id.*

On January 25, 2019, the NJEA issued a further revised guidance document that announced a different interpretation of section 6:

During this transitional period, and in the spirit of acting in good faith, NJEA will accept requests to terminate membership *and revoke dues deduction* at any time during the year. Dues deduction will cease on the earliest of these three dates: January 1, July 1, *or 30 days following* the member's anniversary date of employment.

*See* Statement of Material Facts Ex. 12 at 2 (emphasis added). The NJEA's previous guidance, by contrast, had instructed its affiliates to halt payroll deductions on the

---

restricts only his ability to terminate the *payroll deduction* of union dues. The NJEA corrected this error in its revised guidance document on January 25, 2019. *See* Statement of Material Facts Ex. 12 at 2.

earliest of January 1, July 1, or "during the 10 days following" an employment-anniversary date. *See* Statement of Material Facts Ex. 11 at 2.

## SUMMARY OF ARGUMENT

When a public employee resigns from the union, he is no longer a "member" of that union—and public employers are constitutionally forbidden to divert a non-member's wages to the union unless the employee "clearly and affirmatively consent[s] before any money is taken." *Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2486 (2018); *see also id.* ("Neither an agency fee nor any other payment to the union may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay.").

Section 6, however, not only permits but *requires* public employers to divert union fees from the paychecks of employees who have already quit the union, regardless of whether the employee "affirmatively consents to pay." And section 6 requires these payroll deductions to continue unless the employee remembers to provide written notice to his employer during an annual 10-day "opt out" window—and even then it requires payroll deductions to continue until 30 days after the employment-anniversary date. A regime of this sort is incompatible with *Janus*, and it is exposing school districts and public employers throughout the state to potentially massive liability under 42 U.S.C. § 1983. The Court should declare the statute unconstitutional and enjoin its enforcement or, at a minimum, provide clear and unambiguous guidance as to its requirements.

The NJEA does not even attempt to defend the constitutionality of a statute that compels public employees to continue paying union dues after resigning their union membership. Instead, the NJEA has decided to replace the statute that the legislature enacted with a regime of its own creation. The NJEA says that it "interprets" section 6 as establishing *three* different annual dates on which payroll deductions may be terminated: January 1, July 1, or either 10 or 30 days after an employment-anniversary date, depending on which "guidance" document the NJEA is using. *See* Statement of Material Facts at ¶¶ 20–21; Ex. 11–12. Then the NJEA insists that employees need not provide written notice to their employer during the 10-day statutory opt-out window—even though section 6 requires that notice to be provided *during* that 10-day period before an employer can stop the payroll deduction of union fees. *See* Exhibit 1 ("Employees who have authorized the payroll deduction of fees to employee organizations may revoke such authorization by providing written notice to their public employer *during the 10 days following* each anniversary date of their employment." (emphasis added)). Indeed, the NJEA instructed Ms. Poulson, Mr. Sandberg, and Mr. Santiago's employers to halt payroll deductions approximately 30 days after the plaintiffs' employment-anniversary dates—even though *none* of the plaintiffs have provided written notice to their employers during the 10-day window described in section 6.[5] *See* ECF No. 87 at 9–10.

---

5. Mr. Santiago cc'd his employer on his union-resignation e-mail of August 8, 2018, in which he "ask[ed] that dues no longer be taken from my pay." It is not clear whether an e-mail qualifies as "written notice" under the statute, but even if it did the notice was sent before Mr. Santiago's employment-anniversary date of September 1, and outside the 10-day window that runs from September 1 through

The NJEA is flouting the law of New Jersey as well as the Supreme Court's ruling in *Janus*—and it is instructing school districts throughout the State to defy the law as well. The NJEA and the school districts are violating the Workplace Democracy Enhancement Act by halting the payroll deduction of union dues for employees who never provided "written notice" to their employer during the 10-day window described in section 6. And they are violating *Janus* by taking union fees from the paychecks of employees who have resigned their union membership, without securing the employee's "clear[] and affirmative[] consent." *See Janus*, 138 S. Ct. at 2486. The NJEA's attempt to steer a middle path between the commands of section 6 and the commands of *Janus* has left the union in violation of *both* New Jersey law and *Janus*—and it has dragged unsuspecting school districts into violating their legal obligations as well.

The NJEA may fear that complying with section 6 as written will expose the union to liability under 42 U.S.C. § 1983. If that is the case, then the proper response is to file a declaratory-judgment action and ask a court to pronounce the statute unconstitutional. The NJEA has not done this, perhaps because it also fears that a judicial pronouncement enforcing *Janus* will prevent the union from collecting fees from *any* employee who has resigned from the union. Instead, the NJEA thinks it can make up its own rules in response to an unconstitutional statute and an unpalatable Supreme

---

September 11. Ms. Poulson and Mr. Sandberg have not provided any type of written notice to their employers. *See* Declaration of Melissa Poulson ¶ 4; Declaration of Michael Sandberg ¶ 4; Declaration of Leonardo Santiago ¶ 4.

Court ruling—and then instruct public employers to obey the union's concoctions rather than the laws of New Jersey or the commands of the Supreme Court.

The Court cannot allow this to continue. If section 6 is constitutional, then the unions and the school districts must obey and enforce the statute as written. If section 6 is unconstitutional, then a court must declare the statute unconstitutional and enjoin the defendants from enforcing it, which is the only lawful way that the NJEA and the school districts can depart from the requirements of section 6. A court cannot tolerate a regime in which a private entity such as the NJEA decides what the law should be and instructs school districts to act in defiance of a duly enacted statute that no court has declared unconstitutional.

## ARGUMENT

### I.   SECTION 6 IS UNCONSTITUTIONAL AND ITS ENFORCEMENT MUST BE ENJOINED

Section 6 must be interpreted according to what the statute says. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461–62 (2002) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." (citation omitted)). And the statute is clear that the *only* possible date on which a public employee may terminate payroll deductions is the 30th day after his employment-anniversary date:

> Employees who have authorized the payroll deduction of fees to employee organizations may revoke such authorization by providing written notice to their public employer during the 10 days following each anniversary date of their employment. . . . An employee's notice of revocation of authorization for the payroll deduction of employee organization fees *shall be effective on the 30th day after the anniversary date of employment.*

*See* Exhibit 1 (emphasis added). There is no way to read this language as allowing a revocation to take effect on January 1 or July 1. The word "shall" imposes a mandatory, non-discretionary duty. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion"). And section 6 *deleted* the previous statutory language that had allowed terminations of payroll deductions to take effect on the earlier of January 1 or July 1, replacing that regime with a single date that applies to *every* attempted revocation of payroll deductions.

The NJEA acknowledges that under section 6, "notice of termination of membership *must be made* within a window of 10 days following the individual employee's anniversary date of hire." Statement of Material Facts Ex. 11 at 2. Thus, an employee who quits the union or notifies his employer before that 10-day window cannot have his notification held in abeyance, and then have his payroll deductions automatically terminated on the 30th day after his employment-anniversary date. The statute requires a written notice *during* that 10-day window, and if the employee forgets he is stuck paying union fees for at least another year.

But then the NJEA *denies* that section 6 provides the *exclusive* means for terminating payroll deductions. Instead, the NJEA claims that section 6 offers public employees an *additional* mechanism for halting the payroll deduction of union dues, in addition to the options specified in the NJEA's union-membership applications. *See* Statement of Material Facts at ¶¶ 20–21; Ex. 11–12. The NJEA also claims that an employee can "opt out" of payroll deductions under section 6 without providing

written notice to their employer during the 10-day statutory window. *See id.* None of this is a permissible interpretation of the statute.

### A.  Section 6 Is The Exclusive Means For A Public Employee To Halt The Payroll Deduction Of Union Dues Under New Jersey Law

Section 6 provides the exclusive means for a public employee to cancel payroll deductions. The previous of version of N.J. Rev. Stat. § 52:14-15.9e allowed public employees to revoke their authorizations for payroll deductions "at any time" but prevented those revocations from taking effect until the sooner of January 1 or July 1:

> Any such written authorization may be withdrawn by such person holding employment at any time by the filing of notice of such withdrawal with the above-mentioned disbursing officer. The filing of notice of withdrawal shall be effective to halt deductions as of the January 1 or July 1 next succeeding the date on which notice of withdrawal is filed.

See Exhibit 1. Section 6 deleted this statutory provision and replaced it with the following language:

> Employees who have authorized the payroll deduction of fees to employee organizations may revoke such authorization by providing written notice to their public employer during the 10 days following each anniversary date of their employment. . . . An employee's notice of revocation of authorization for the payroll deduction of employee organization fees shall be effective on the 30th day after the anniversary date of employment.

*Id.* How can the union possibly contend—in the face of this statutory language and the deletion of the earlier statute—that public employees may *continue* to terminate payroll deductions effective January 1 or July 1?

The union does not go so far as to argue that the word "may" signifies a statutory grant of permission that can serve only to expand rather than restrict the scope of permissible conduct. Any such interpretation of the statute is foreclosed by the sentence that *prevents* an employee's notice of revocation from taking effect until the 30th day after his employment-anniversary date. It is also foreclosed by the legislature's decision to delete rather than retain the earlier statutory language that had allowed revocations of payroll deductions to take effect on the next January 1 or July 1. The statute was enacted to define the circumstances in which a public employee may withdraw his previous authorization for payroll deduction, and to close off other means of revoking unions payroll deductions that would have been permitted in the absence of the statute. The word "may" means only that an employee is permitted and not compelled to revoke his payroll deductions when the annual 10-day opt-out window comes around. It does not mean that public employees remain free to revoke their payroll deductions in any other manner that is not explicitly foreclosed by New Jersey law.

The union instead makes a more limited argument: It contends that section 6 should not provide the exclusive means of revoking payroll deductions when applied to the *subset* of public employees who authorized payroll deductions by signing NJEA membership applications before the statute's enactment.[6] In these membership applications, the employees signed a provision that stated: "This authorization may be

---

6. As we understand the union's argument, section 6 would provide the exclusive means of revocation for employees who sign union-membership applications *after* the statute's enactment—even if a post-WDEA membership application purports to establish other ways for an employee to cancel his previous authorization of

terminated only by prior written notice from me effective January 1 or July 1 of any year." *See* Statement of Material Facts at ¶¶ 5–8; Exs. 1–4. The union claims that statutes should not be interpreted to have an "adverse retroactive effect," and that section 6 should therefore be construed to preserve a public employee's ability to halt payroll deductions effective January 1 or July 1—even though the terms of this union-membership application depart from the requirements of section 6. *See* ECF Doc. 87 at 8. This construction of section 6 is impermissible for many reasons.

The first problem is that section 6 applies to *everyone* who has previously authorized the payroll deduction of union dues, and it draws no distinction between those who authorized payroll deductions before or after the statute's enactment. The statute says:

> Employees *who have authorized* the payroll deduction of fees to employee organizations may revoke such authorization by providing written notice to their public employer during the 10 days following each anniversary date of their employment.

Exhibit 1 (emphasis added). The statute uses the present perfect verb tense, which encompasses all payroll authorizations that have already been completed. There is no way to interpret this language in a manner that establishes one set of rules for

---

payroll deductions. But the union's briefing and the NJEA's "Guidance" Document are not clear on this point, and we want to be careful not to put words in the union's mouth. The union should state whether it believes that post-WDEA membership contracts can depart from the requirements of section 6; if the answer is "yes," then the union's reliance on the anti-retroactivity canon is doing no work at all and the union must provide a different justification for its interpretation of the statute. *See* ECF No. 87 at 8; ECF No. 86-1 at 20 n.6.

employees who authorized payroll deductions in pre-WDEA union-membership applications, and a different set of rules for public employees who authorize payroll deductions in post-WDEA applications.

The second problem is that the canon against retroactivity applies only to laws that alter the *past legal consequences* of past actions—not to laws that merely change the legal implications of past conduct. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988); *id.* at 219–20 (Scalia, J., concurring) (discussing the distinction between "primary" and "secondary" retroactivity); *Skulski v. Nolan*, 343 A.2d 721, 733 (N.J. 1975) ("'A cardinal rule in the interpretation of statutes is that words in a statute ought not to have a *retrospective operation* unless they are so clear, strong and imperative that no other meaning can be annexed to them, or unless the intent of the (L)egislature cannot otherwise be satisfied.'" (quoting *Kopczynski v. County of Comden*, 66 A.2d 882, 884 (N.J. 1949) (emphasis added)).[7] No one is arguing for a retroactive or "retrospective operation" of section 6 that would undo and nullify previous terminations of payroll deductions that did not comply with the statute's requirements.

---

7. *See also Landgraf v. USI Film Prod.*, 511 U.S. 244, 293 n.3 (1994) (Scalia, J. concurring) ("'[T]he presumption against retroactivity is not violated by interpreting a statute to alter the future legal effect of past transactions—so-called secondary retroactivity, see *Bowen v. Georgetown Univ. Hospital,* 488 U.S. 204, 219–220 (1988) (Scalia, J., concurring) (citing McNulty, Corporations and the Intertemporal Conflict of Laws, 55 Calif. L. Rev. 12, 58–60 (1967)); cf. *Cox v. Hart,* 260 U.S. 427, 435 (1922). A new ban on gambling applies to existing casinos and casinos under construction, see 511 U.S., at 269–270, n. 24, 114 S. Ct. at 1499, n. 24, even though it "attaches a new disability" to those past investments. The relevant retroactivity event is the primary activity of gambling, not the primary activity of constructing casinos.").

The statute applies prospectively: Going forward, any employee who previously authorized the payroll deduction of union fees must continue paying those fees unless and until they revoke their authorization in accordance with section 6. That the statute may change the legal *implications* of a past decision to authorize payroll deductions does not make the statute "retroactive"—and it does not trigger the anti-retroactivity canon. And in all events, even if one thinks the presumption against retroactivity should apply to this situation, the statutory language is clear: All employees "who have authorized" the payroll deduction of union fees are bound by the terms of section 6. The union never attempts to explain how this statutory text leaves any wiggle room for the interpretation that they propose.

The third problem is that the union *wants* section 6 to have an "adverse retroactive effect" on the union but not on public employees. The membership applications say:

> I hereby request and authorize the disbursing officer of the above school district to deduct from my earnings, until notified of termination, an amount required for current year membership dues and such amounts as may be required for dues in each subsequent year, all as certified by the affiliated and unified organizations, such amounts to be paid to such person as may from time to time be designated by the local association. This authorization may be terminated only by prior written notice from me effective January 1 or July 1 of any year.

*See* Statement of Material Facts at ¶¶ 5–8; Exs. 1–4. This purports to require the employee to continue paying union dues through payroll deductions until the January 1 or July 1 after the employee provides "written notice." But the union *concedes* that section 6 overrides this document with respect to the *union's* entitlement to the

continued payment of dues until January 1 or July 1. The union, for example, insists that an employee who signed a pre-WDEA membership application can terminate payroll deductions on the 30th day following her employment-anniversary date—even when the membership application purports to require payroll deductions to continue past that date until the next January 1 or July 1. *See* ECF No. 87 at 9 ("[A]n employee who signed a membership contract materially similar to that signed by Plaintiffs will be able to cease payroll deduction effective *the earliest of* January 1, July 1, or 30 days following her anniversary." (emphasis added)); *see also* Statement of Material Facts at ¶¶ 20–21; Exs. 11–12. And the union instructed the Kingsway school district to stop the Mr. Santiago's payroll deductions on the 30th day after his employment-anniversary date—even though the terms of his union membership application purported to require payroll deductions to continue until at least January 1, 2019. *See id.* at ¶ 24. A court cannot interpret section 6 to impose an "adverse retroactive effect" on the *union*, while simultaneously insisting that the anti-retroactivity canon precludes an interpretation that would have "adverse retroactive effects" on the *public employee*. Even if the anti-retroactivity canon could be applied to section 6, it cannot be applied in the selective and opportunistic manner that the union proposes.

Finally, the union attempts to characterize the signed membership applications as binding "contracts." *See* Statement of Material Facts at ¶¶ 20–21; Exs. 11–12 ("NJEA believes that the original membership application is a legal and binding contract between the member and the organization."). Even if one were to assume that

these membership applications qualify as contracts,[8] a statute trumps a contract, and contractual provisions that authorize or require a party to act in violation of state law have no legal effect. *See Golden v. Cty. of Union*, 749 A.2d 842, 848 (N.J. 2000); *Merlino v. Borough of Midland Park*, 796 A.2d 203, 207 (N.J. 2002) ("[S]tatutory terms . . . take precedence over any side agreement in contravention of the statute."). Section 6 provides the exclusive mechanism for terminating payroll deductions under New Jersey law, regardless of what any union-membership application or "contract" might say.

### B. No Public Employer May Halt The Payroll Deduction Of Union Dues Under Section 6 Unless The Employee Provides Written Notice During The 10-Day Opt-Out Window

The NJEA's guidance documents also insist that public employees may terminate payroll deductions without providing written notice to their employer *during* the 10-day window that begins on their employment-anniversary date. *See* Statement of Material Facts Ex. 12 at 2. Indeed, it appears that the NJEA thinks that public employees may terminate payroll deductions without giving any notice to their employer at all. *See id.* ("*NJEA will accept* requests to terminate membership and revoke dues deduction at any time during the year. Dues deduction will cease on the earliest of these three dates: January 1, July 1, or 30 days following the member's anniversary date of employment." (emphasis added)). This interpretation of section 6 is equally untenable. Section 6 states clearly and unequivocally that public employees who wish to opt out of payroll deductions must notify their *employer*—and they must do so

---

8.  And they don't, for the reasons provided in Part II, *infra*.

"*during* the 10 days following each anniversary date of their employment." Then and only then may payroll deductions be terminated:

> Employees who have authorized the payroll deduction of fees to employee organizations may revoke such authorization by providing written notice to their public employer *during the 10 days following* each anniversary date of their employment. . . . An employee's notice of revocation of authorization for the payroll deduction of employee organization fees shall be effective on the 30th day after the anniversary date of employment.

A3686 § 6 (emphasis added). The union, however, claims that an employee can terminate payroll deductions under section 6 without any need to comply with statute's notice requirements, *see* ECF No. 87 at 10; Statement of Material Facts Ex. 12 at 2, even though it also states that "notice of termination of membership *must be made* within a window of 10 days following the individual employee's anniversary date of hire." Statement of Material Facts Ex. 12 at 2 (emphasis added).

   None of the plaintiffs in this case provided "written notice to their public employer" during the 10-day window described in section 6. Mr. Santiago cc'd his employer on his union-resignation e-mail of August 8, 2018, but that occurred before Mr. Santiago's employment-anniversary date of September 1. Ms. Poulson and Mr. Sandberg have not notified their employers at all. Ms. Poulson resigned her union membership over the phone, and Mr. Sandberg resigned over e-mail to his local union president. Of course, neither Ms. Poulson nor Mr. Sandberg needed to provide written notice to their employer under *Janus* because unions are constitutionally forbidden to take money from a non-member's paycheck unless the employee clearly and affirmatively consents. *See Janus*, 138 S. Ct. at 2486. So there is no need under

*Janus* for an employee to take additional steps to prevent payroll deductions after resigning from the union.

The union refused to comply with *Janus* and continued to take money from the plaintiffs' paychecks after they had resigned their union membership. *See* ECF No. 87 at 10 (acknowledging that Ms. Poulson, Mr. Sandberg, and Mr. Santiago "will continue to have dues deducted until October 1, 2018, September 25, 2018, and October 1, 2018"); *see also* Statement of Material Facts ¶ 23. This was also contrary to the union's own guidance document in existence at the time, which stated that "[d]ues deduction will cease on the earliest of these three dates: January 1, July 1, or *during the 10 days following* each anniversary date of a member's employment." *See* Statement of Material Facts Ex. 11 at 2 (emphasis added). The NJEA halted payroll deductions *30* days after the plaintiffs' anniversary dates, not "during the 10 days following" that anniversary date. Worse, the "earliest of these three dates" for Ms. Poulson and Mr. Sandberg was July 1—not 10 days following their employment-anniversary dates—because each of them had resigned from the union on June 28, 2018. It is therefore critical that the Court either find this statute unconstitutional or at least offer clear rules for applying the statute, because the union could not even follow the very rules it enacted for itself to follow in response to this case!

Finally, the union and school districts are also defying state law by terminating the plaintiffs' payroll deductions on the 30th day after their employment-anniversary dates when none of the plaintiffs have provided the "written notice" required by the section 6. The union has not presented any argument for how section 6 can be "interpreted" to make the written-notice requirement optional, and the union and

school districts are violating the law of New Jersey by halting the payroll deductions of public employees who have not provided written notice during the statute's 10-day window.

Of course, all of these requirements in section 6 are unconstitutional, because public employees have a constitutional right to halt payroll deductions immediately upon resigning from the union. *See Janus*, 138 S. Ct. at 2486 ("Neither an agency fee nor any other payment to the union may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay."). But a court must *declare* section 6 unconstitutional before the NJEA and the school districts can assert a prerogative to ignore it. Section 6 as written is incompatible with *Janus*, and the Court should declare that the defendants cannot enforce a statute that prevents public employees from terminating payroll deductions after they have resigned their union membership.

## II. THE PLAINTIFFS DID NOT CONTRACTUALLY WAIVE THEIR CONSTITUTIONAL RIGHTS UNDER *JANUS* BY SIGNING THEIR UNION-MEMBERSHIP APPLICATIONS

The NJEA also contends that the plaintiffs have contractually waived their constitutional right under *Janus* to withhold payments from a union that they do not belong to. In the union's view, this waiver occurred when the plaintiffs signed union-membership applications that included the following language:

> I hereby request and authorize the disbursing officer of the above school district to deduct from my earnings, until notified of termination, an amount required for current year membership dues and such amounts as may be required for dues in each subsequent year, all as certified by the affiliated an unified organizations, such amounts to be paid to such

> person as may from time to time be designated by the local association.
> This authorization may be terminated only by prior written notice from
> me effective January 1 or July 1 of any year.

*See* Statement of Material Facts at ¶¶ 5–8; Exs. 1–4. The union calls this document a "contract," and it claims that the plaintiffs undertook a contractual obligation to continue paying union dues until January 1 or July 1, thereby waiving their constitutional right to terminate payroll deductions immediately upon resigning from membership. The union's argument fails for multiple independent reasons.

### A.   The Membership Application Is Not a "Contract"

The first problem with the union's argument is that the "membership application" is not a contract of any sort. A contract is a mutual exchange of promises, supported by consideration. *See Sipko v. Koger, Inc.*, 70 A.3d 512, 521–22 (N.J. 2013). The membership applications that the plaintiffs signed do not qualify as contracts because there is no other party to these documents, and they do not provide any consideration to the plaintiffs.

### 1.   The Membership Application Is Not A "Contract" Because It Bears Only The Employee's Signature And There Is No Other Party To The Document

A "contract" requires multiple parties who must give their formal consent to the agreement. *See Friedman v. Tappan Development Corp.*, 126 A.2d 646, 650 (N.J. 1956). Yet one will search the membership-application forms in vain for any other signatory who consented to this document. The documents bear only the signature of the employee; no one from the union signed it, and no one from the signatory's employer signed it either. The union has not identified the other "party" to this supposed "contract" or produced evidence of that other party's consent.

It is impossible to read the membership application and think that it creates a "contract" between the signatory and the NJEA, or between the signatory and his employer. The entire statement reads as a unilateral authorization rather than a bargained-for agreement, and neither the union nor the employer purports to undertake *any* duties or obligations under the terms of this document. *See* Statement of Material Facts, Exs. 1–4 ("I hereby *request and authorize* the disbursing officer of the above school district to deduct from my earnings . . . ." (emphasis added)). This document is nothing more than a unilateral directive that the signatory is free to revoke.

### 2. The Membership Application Is Not A "Contract" Because It Does Not Provide Consideration To The Plaintiffs

There is a more serious problem with the NJEA's attempt to describe the membership application as a "contract": A "contract" requires consideration, and the membership application does not describe *anything* that the signatory is to receive in exchange for the supposed promise to continue paying union dues until January 1 or July 1. *See Sipko*, 70 A.3d at 521–22. None of the sentences in the "dues authorization" statement—nor anything else in the membership application—describes any promise that the union or the employer has made, or any duty that they have undertaken under the terms of this alleged agreement. There is *nothing* that the union or the signatory's employer could do that would breach this supposed "contract" or expose themselves to contractual liability. The union could expel Ms. Curcio from membership tomorrow without violating anything in the terms of this membership

application, and if Ms. Curcio tried to sue the union for "breaching" this membership agreement, she would be thrown out of court.

The union's duty to represent the plaintiffs in collective-bargaining matters cannot qualify as consideration—even if the union had promised to provide this representation in the membership application (which it didn't). The union was already under a pre-existing legal duty to represent and negotiate on behalf of *all* employees in the bargaining unit—regardless of whether they join the union or commit to pay dues—and a promise to perform a pre-existing legal duty does not establish consideration. *See Segal v. Lynch*, 48 A.3d 328, 342 (N.J. 2012) ("[C]onsideration cannot be a promise to perform a pre-existing duty" (citing *Williston on Contracts* § 7:37 (4th ed. 2008)). And Ms. Curcio could not sue the union for "breaching" the membership application if it decided to expel her from membership. There is *nothing* that qualifies as consideration from the NJEA or from Ms. Curcio's employer, or from anyone else who might conceivably be a "party" to this document.

> ### 3. The Membership Application Did Not Need To Take The Form Of A Contract Because New Jersey Law At The Time Mandated That Payroll Deductions Continue Until January 1 Or July 1

It also was not necessary for these payroll-deduction authorizations to take the form of a contract, because New Jersey law at the time independently required payroll deductions to continue until January 1 or July 1. Before the Workplace Democracy Enhancement Act, the law of New Jersey stated that:

> Any such written authorization may be withdrawn by such person holding employment at any time by the filing of notice of such withdrawal with the above-mentioned disbursing officer. The filing of notice of

> withdrawal shall be effective to halt deductions as of the January 1 or
> July 1 next succeeding the date on which notice of withdrawal is filed.

*See* Exhibit 1. So there was no need to create a legally binding *contractual* obligation to continue payroll deductions until January 1 or July 1, when there was already a legally binding *statutory* obligation to do exactly that. The statement in the union-membership application that "This authorization may be terminated only by prior written notice from me effective January 1 or July 1 of any year" was not a contractual commitment, but a mere statement that informed the signatory of what New Jersey law already required. And now that the legislature has replaced this statutory regime with section 6, the statements in the earlier membership applications must give way to the new law that the legislature has enacted.

### B. Even If The Membership Application Were A "Contract," It Does Not Satisfy *Janus*'s Requirements For A Waiver Of Constitutional Rights

Even if this Court concludes that the union-membership application somehow qualifies as a "contract," Ms. Curcio is entitled to immediately quit the union and terminate payroll deductions for a separate and independent reason: The membership application does not qualify as a legally valid waiver of Ms. Curcio's constitutional rights under *Janus*.

*Janus* establishes two propositions that govern the enforceability of "maintenance of dues" agreements. First, non-union members have a constitutional right to prevent public-employee unions from tapping their paycheck. *See Janus*, 138 S. Ct. at 2486; *see also id.* ("Neither an agency fee nor any other payment to the union may

be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay."). Second, any waiver of this constitutional right must be "freely given" and "shown by clear and compelling evidence." *See id.* ("[T]o be effective, the waiver must be freely given and shown by 'clear and compelling' evidence." (citation omitted)); *see also id.* (citing *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938), which defines "waiver" as "an intentional relinquishment or abandonment of a known right or privilege."). It is not enough for the union to point to a "contract" that purports to obligate Ms. Curcio to continue paying union dues after resigning from membership. Instead, the union must show that Ms. Curcio executed a valid and effective *waiver* of her constitutional rights when she submitted that membership application—and that waiver must meet the demanding standards of *Janus*: "freely given" and "shown by clear and compelling evidence." *See Janus*, 138 S. Ct. at 2486. The membership application that Ms. Curcio signed does not come close to meeting this demanding standard.

First. Ms. Curcio did not execute a "freely given" waiver of her *Janus* rights because she signed the union-membership application while working in an unconstitutional agency shop. If Ms. Curcio had refused to sign the membership-application form, she would have been subjected to an unconstitutional financial penalty in the form of "representation fees." A person who waives her constitutional rights at a time when she is threatened with an unconstitutional financial penalty if she refuses to sign the waiver has not made a "freely given" waiver of those constitutional rights. *See Janus*, 138 S. Ct. at 2486.

Second. Ms. Curcio did not execute a "freely given" waiver of her *Janus* rights because she was not even aware of that she *had* a constitutional right to withhold payments from the union when she submitted her membership application on October 11, 2017. *Janus* had not yet been decided, and the union does not explain how Ms. Curcio could have "waived" a constitutional right that she did not even know about. *See Brady v. United States*, 397 U.S. 742, 748 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."); *Johnson* v. *Zerbst*, 304 U.S. 458, 464 (1938) ("A waiver is ordinarily an intentional relinquishment or abandonment of a *known* right or privilege." (emphasis added)).

Whether the unions can enforce "maintenance of dues" agreements in post-*Janus* contracts presents a closer question. In these situations, it is at least possible to imagine a scenario in which an employee is fully informed of his constitutional rights under *Janus*, and knowingly and intelligently waives those rights in exchange for valuable consideration. None of the plaintiffs in this case, however, are parties to a post-*Janus* contract, and it would be prudent to await an actual case that presents this issue before ruling on the constitutionality or enforceability of these hypothetical post-*Janus* contractual provisions. For now, it is enough to say that public employees who signed "maintenance of dues" agreements while working in a pre-*Janus* agency shop have not executed a legally valid waiver of their constitutional rights.

**C.    The Second Circuit's Ruling In *NLRB v. Penn Cork* Allows Any Employee Who Authorized Payroll Deductions While Working In A Union Shop Or Agency Shop To Rescind That Authorization If His Employer Becomes Right To Work, Even If The Employer Signed A Previous Dues Authorization**

Ms. Curcio may resign from the union and immediately halt payroll deductions for yet another reason: Even if this Court believes that Ms. Curcio's membership application established a valid contractual of her constitutional rights, Ms. Curcio can *still* rescind that document because she signed it while working in an unconstitutional agency shop. Ms. Curcio joined the union and authorized payroll deductions at a time when she was compelled to pay either membership dues or representation fees to the union regardless of whether she joined, and she agreed to payroll deductions only because she was forced to pay money to the union in violation of her constitutional rights. When an employee submits a membership application or dues-authorization form while working in a union shop or agency shop, she can immediately rescind that authorization when her employer becomes right to work—even when the authorization purports to be legally binding or "irrevocable." *See NLRB v. Penn Cork & Closures, Inc.*, 376 F.2d 52 (2d Cir. 1967) (Friendly, J.).

The employees in *Penn Cork* signed payroll-deduction authorization forms while working in a union shop, where every employee was compelled to belong to the union and pay membership dues. The dues-authorization forms claimed to be irrevocable for one year or until the collective-bargaining agreement expired, whichever occurred sooner, and thereafter for yearly periods unless revoked within an annual 15-day window. *See Penn Cork*, 376 F.2d at 54. In January of 1965, the employees voted to rescind the union-security provisions of the collective-bargaining agreement, and

57 employees promptly quit the union and demanded that their employer immediately halt the payroll deduction of union dues. *See id.* The employer refused and insisted that payroll deductions must continue until the next 15-day opt-out window—consistent with the terms of the dues-authorization forms that the employees had signed. *See id.* The National Labor Relations Board declared this an unfair labor practice and ordered a refund of all dues that were collected after the employees revoked their authorizations. *See id.* The Second Circuit, per Judge Friendly, enforced the Board's order. Judge Friendly observed that the "union shop agreement . . . can be said to have influenced the workers' decisions to authorize dues checkoffs," and for that reason the Board appropriately found that such authorizations become immediately revocable when the union-shop arrangements are removed—even if the dues-authorization forms would normally qualify as binding contractual obligations. *Penn Cork*, 376 F.2d at 55–56; *see also id.* at 56 ("[R]escission of the union security clause as a result of a 9(e)(1) election should also work a rescission of checkoffs authorized by employees because of the union security provisions.").

  *Penn Cork* is indistinguishable from this case[9]—and it is incompatible with the NJEA's belief that its signed membership-application forms are irrevocable in the wake of *Janus*. If the NJEA wants to insist that Ms. Curcio's membership application is irrevocable, then it must contend that *Penn Cork* was wrong to allow the employees

---

9. The only differences between this case and *Penn Cork* are that Ms. Curcio signed his dues-authorization forms while working in an agency shop rather than a union shop, and that Ms. Curcio's employer became right-to-work on account of a Supreme Court ruling rather than an employee election. Neither of these differences should have any effect on the enforceability of previous contractual obligations.

in that case to rescind their purportedly irrevocable dues authorizations after the union-shop arrangements were nixed. Perhaps the union is prepared to argue that *Penn Cork* is wrong, but this Court should not lightly create a division of authority by insisting that pre-*Janus* membership applications can never be revoked—even after a Supreme Court ruling that abolishes every agency shop in the public sector.

* * *

The defendants cannot enforce section 6 in a manner that compels union payments from public employees who have quit the union. And they cannot rely on the plaintiffs' pre-*Janus* membership-application forms to continue payroll deductions after their resignation from union membership. The Court should declare section 6 unconstitutional and permanently enjoin its enforcement, and it should enjoin the defendants from enforcing "maintenance of dues" provisions that appear in pre-*Janus* union-membership applications.

# CONCLUSION

The motion for partial summary judgment and permanent injunction should be granted.

Respectfully submitted.

/s/ Walter S. Zimolong

JONATHAN F. MITCHELL *
Mitchell Law PLLC
106 East Sixth Street, Suite 900
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

* admitted *pro hac vice*

Dated: April 3, 2019

WALTER S. ZIMOLONG
Zimolong LLC
P.O. Box 552
Villanova, PA 19085
(215) 665-0842
wally@zimolonglaw.com

TALCOTT J. FRANKLIN*
SHANNON W. CONWAY*
Talcott Franklin P.C.
1920 McKinney Avenue
7th Floor
Dallas, Texas 75201
(214) 642-9191
(214) 709-6180
tal@talcottfranklin.com
sconway@talcottfranklin.com

*Counsel for Plaintiffs and
the Proposed Classes*

## CERTIFICATE OF SERVICE

I certify that on April 3, 2019, I served this document by CM/ECF upon:

FLAVIO L. KOMUVES
ROBERT A. FAGELLA
Zazzali, Fagella, Nowak, Kleinbaum &
Friedman
570 Broad Street, Suite 1402
Newark, New Jersey 07102
(973) 623-1822
fkomuves@zazzali-law.com
rfagella@zazzali-law.com

JOHN WEST
LEON DAYAN
JACOB KARABELL
ADAM BELLOTTI
Bredhoff & Kaiser PLLC
805 15th Street NW
Washington, D.C. 20005
(202) 842-2600
jwest@bredhoff.com
ldayan@bredhoff.com
jkarabell@bredhoff.com
abellotti@bredhoff.com

*Counsel for the Union Defendants*

ERIC HARRINGTON
National Education Association
1201 16th Street NW
Washington, D.C. 20036-3290
(202) 822-7018
eharrington@nea.org

*Counsel for the National Education
Association*

FRANK P. CAVALLO JR.
ANDREW W. LI
Parker McCay P.A.
9000 Midlantic Drive, Suite 300
P.O. Box 5054
Mount Laurel, New Jersey 08054
(856) 596-8900
fcavallo@parkermccay.com
ali@parkermccay.com

*Counsel for the Clearview Board of
Education*

BRETT E.J. GORMAN
Parker McCay P.A.
9000 Midlantic Drive, Suite 300
P.O. Box 5054
Mount Laurel, New Jersey 08054
(856) 596-8900
bgorman@parkermccay.com

*Counsel for the Harrison Township
Board of Education*

JEFFREY R. CACCESE
Comegno Law Group P.C.
521 Pleasant Valley Avenue
Morristown, New Jersey 08057
(856) 234-4144
jcaccese@comegnolaw.com

*Counsel for the Kingsway Regional
School District Board of Education*

LAUREN A. JENSEN
DONNA S. ARONS
Office of the Attorney General
25 Market Street
Trenton, New Jersey 08608
(609) 376-3100
lauren.jensen@law.njoag.gov
donna.arons@dol.lps.tate.nj.us

*Counsel for the State Defendant*

CHRISTINE LUCARELLI
DON HOROWITZ
New Jersey Public Employment
Relations Commission
P.O. Box 429
Trenton, New Jersey 08625-0429
(609) 292-9830
mail@perc.state.nj.us

*Counsel for the PERC Defendants*

 /s/ Walter S. Zimolong
WALTER S. ZIMOLONG
*Counsel for Plaintiff and Proposed Classes*